NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250109-U

NO. 4-25-0109

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MIEKIALE T. FIELDS, | ) | No. 22CF1179 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Vancil and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The appellate court affirmed defendant's convictions and sentences for the felony offenses of aggravated fleeing a police officer and unlawful possession of a weapon by a felon, two misdemeanor offenses, and four traffic-related offenses, where (1) the evidence was sufficient to prove beyond a reasonable doubt that defendant was the driver of his vehicle, (2) the trial court did not abuse its discretion in admitting into evidence videos from defendant's cell phone, (3) the unlawful-possession-of-a-weapon-by-a-felon statute is constitutional, and (4) his 14-year prison sentence is not excessive. However, defense counsel provided ineffective assistance to defendant by failing to file a waiver of assessments; thus, the appellate court remanded to allow defendant to file an assessment waiver.

¶ 2     Defendant, Miekiale T. Fields, was charged with aggravated fleeing a police officer

(625 ILCS 5/11-204.1(a)(1) (West 2022)), two counts of unlawful possession of a weapon by a

felon (720 ILCS 5/24-1.1(a) (West 2022)), driving on a revoked license (625 ILCS 5/6-303 (West

2022)), reckless driving (625 ILCS 5/11-503(a)(1) (West 2022)), illegal transportation or

possession of alcohol (625 ILCS 5/11-502(a) (West 2022)), driving without lights when required

(625 ILCS 5/12-201(b) (West 2022)), disobeying a stop sign (625 ILCS 5/11-1204(b) (West 2022)), and speeding (625 ILCS 5/11-601(b) (West 2022)). Following a trial, the jury found defendant guilty of all charges. The trial court sentenced defendant to consecutive prison terms of nine years for unlawful possession of a weapon by a felon and five years for aggravated fleeing. The court also sentenced defendant to 364 days in jail for the two misdemeanor offenses of driving on a revoked license and reckless driving. Finally, the court ordered defendant to pay fines, fees, and assessments. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the court erred in allowing the State to introduce into evidence videos found on his phone, (3) the unlawful-possession-of-a-weapon-by-a-felon statute is "facially unconstitutional," (4) the court abused its discretion in sentencing him to 14 years in prison, and (5) his trial counsel was ineffective for failing to file a waiver of assessments. For the reasons that follow, we affirm defendant's convictions and sentences but remand to allow defendant to file an assessment waiver.

¶ 3                          I. BACKGROUND

¶ 4             A. Overview of the Case, Charges, and the State's Motion *in Limine*

¶ 5             On the night of November 17, 2022, a Chenoa police officer observed a Dodge Charger traveling at a high rate of speed eastbound on Route 24 toward Chenoa in McLean County, Illinois. When the officer attempted to conduct a traffic stop, the vehicle initially pulled over before speeding away. The officer followed the vehicle but lost sight of it. The officer eventually located the vehicle at Chenoa Auto Repair. The vehicle was unoccupied and registered to defendant. When police searched the vehicle, they found a loaded Glock 27 handgun, with serial number BVLK336, and an Apple iPhone. Data extracted from the iPhone indicated that it belonged to defendant. In the trunk of the vehicle were tattooing supplies.

¶ 6        The next morning, defendant was arrested at Chenoa Fitness Center, about two blocks from Chenoa Auto Repair. Defendant had a key to the Charger in his pocket. Defendant was subsequently charged with (1) two felonies: aggravated fleeing a police officer and unlawful possession of a weapon by a felon; (2) two misdemeanors: driving on a revoked license and reckless driving; and (3) four traffic-related offenses: illegal transportation or possession of alcohol, driving without lights when required, disobeying a stop sign, and speeding.

¶ 7        Before trial, the State filed a motion *in limine* seeking to admit at trial two photographs and two videos extracted from defendant's cell phone showing the Glock 27 handgun found in defendant's vehicle. The State explained that it edited the two videos to remove 14 seconds from one video and 11 seconds from the other that "almost exclusively showed the Defendant manipulating a large amount of U.S. Currency." Following a hearing, the trial court granted the State's motion, finding the probative value outweighed the prejudicial effect of the videos.

¶ 8                                B. Defendant's Jury Trial

¶ 9        At defendant's jury trial, Chenoa police officer Timothy Johnson testified that he was on patrol at approximately 9:50 p.m. on November 17, 2022, and traveling westbound on Route 24, away from Chenoa, when he saw a Dodge Charger traveling eastbound on Route 24 at "a high rate of speed." The speed limit on Route 24 was 55 miles per hour. According to Johnson's radar, the Charger was traveling 71 miles per hour. As a result, Johnson made a U-turn and began following the vehicle. According to his radar, the Charger was then traveling 78 miles per hour.

¶ 10        Johnson activated his emergency lights to initiate a traffic stop just west of Chenoa. The Charger came to a stop, and Johnson exited his vehicle and walked toward the passenger side of the vehicle. As he did so, Johnson could not see the front seat of the vehicle but was able to see

that no one was in the back seat. As Johnson approached the vehicle, it fled eastbound toward Chenoa. Johnson then returned to his vehicle and began chasing the Charger. Johnson was unable to catch up to the Charger, despite traveling up to 90 miles per hour. Johnson observed that the driver turned off the vehicle's headlights and ran a stop sign. Johnson lost sight of the vehicle near a Casey's gas station off Cemetery Avenue.

¶ 11 Johnson found the Charger about two minutes later approximately one block north of Casey's at Chenoa Auto Repair. No one was in the vehicle, and Johnson saw no one on foot. Johnson searched the vehicle and found a Glock 27 handgun between the driver's seat and driver's side door, an open can containing an alcoholic beverage in the center console cup holder, an open bottle of wine on the driver's side floor, and a cell phone on the front passenger seat that was on and running a navigation application (app).

¶ 12 Johnson testified that he took two statements from Amanda Weathersby related to "this incident" in October 2023. Defendant never made any statements to Johnson.

¶ 13 Zachary Bee testified that he called Johnson from Chenoa Fitness Center on November 18, 2022, because he "had seen a picture of someone [Johnson] was looking for, and he saw the person." Defendant was that person. Johnson was not on duty, so he called his boss, "Chief [Travis] Cornwall." Cornwall arrived and talked to defendant. Later that morning, a woman in a small red Chevrolet came to the fitness center to give defendant a ride. Bee told the woman that defendant "went down the street" to "the police station."

¶ 14 Brandon King testified that he was at Chenoa Fitness Center on November 18, 2022, and allowed defendant to use his cell phone. King testified that defendant used Facebook Messenger to contact someone.

¶ 15 Clayton Bahler testified that he was working at Chenoa Fitness Center on

November 18, 2022. He was the first person at the gym that day and opened the doors at 7 a.m. Defendant arrived at approximately 7:05 a.m. Bahler had never seen defendant before that day. Defendant asked Bahler what town he was in and how far he was from Peoria, Illinois. Defendant also asked to borrow Bahler's phone so he could call his girlfriend to pick him up.

¶ 16 Kristen Hamamoto, a digital forensic analysist for the Mid-States Organized Crime Information Center, was offered by the State and certified by the trial court as an expert in digital forensic analysis and examination. Hamamoto testified that she extracted all the data from the cell phone found inside the Charger. When she finished extracting data from the phone, a report was automatically generated by Graykey software containing "the device information and a log of events." That report was admitted into evidence with no objection. According to the report, the phone belonged to defendant. Other reports were created using Cellebrite software and showed the videos, images, and messages extracted from the phone. Those reports were admitted into evidence without objection.

¶ 17 Cornwall, the chief of the Chenoa Police Department, testified that he was on duty at approximately 9 a.m. on November 18, 2022, and went to Chenoa Fitness Center because he "was alerted to a possible suspect being in the building." When Cornwall arrived at the fitness center, he found defendant. Cornwall detained, handcuffed, and searched defendant. Upon searching defendant's pockets, Cornwall discovered a key to the Dodge Charger. Cornwall transported defendant to the police department, where he interviewed defendant. That interview was video recorded. The recording was admitted into evidence and played for the jury. During that interview, defendant denied fleeing from a traffic stop the night before. He said he "let" his "girl['s] brother" drive his car the day before. Defendant refused to tell officers where he was from or why he was in Chenoa.

¶ 18 As part of his investigation, Cornwall went to Chenoa Auto Repair to obtain surveillance video from November 17, 2022. Cornwall recorded the video on his cell phone. That video was admitted into evidence and played for the jury. At the end of the video, someone is seen getting out of the Dodge Charger. That person's face and clothing were not visible but, according to Cornwall, the shoes were distinct because "[t]hey had a very reflective material on them." Cornwall took a photo of defendant at the police station on November 18, 2022, wearing shoes with reflective material. Cornwall collected defendant's shoes as evidence. The shoes were admitted into evidence at trial and shown to the jury.

¶ 19 Cornwall spoke with Briana Nash on the morning of November 18, 2022. She was driving a red Chevrolet. Cornwall determined that Nash was looking for defendant. Cornwall told Nash that defendant was "going to be arrested and taken to jail."

¶ 20 Hamamoto provided Cornwall with the data she extracted from the iPhone. That data included two videos and five photographs, which were all created in October 2022. Over defendant's objection, the trial court admitted the photos and videos into evidence, and they were shown to the jury.

¶ 21 The first photograph, according to Cornwall, showed the Glock 27 that was found inside defendant's vehicle. The second photograph showed two guns and cash on a table. According to Cornwall, one of those guns was the Glock 27. The first video was nine seconds in length. It initially showed cash and three guns, including the Glock 27, on a table. An individual's hands were then shown picking up the Glock 27 handgun, putting it down, and then picking up a large stack of cash. The final two seconds of the video showed defendant's face. The video concluded with defendant waving a stack of cash near his face. The second video was three seconds long and showed the sleeve of defendant's sweatshirt and his tattoo from the previous video. The

video showed defendant's hand manipulating a large stack of cash, while three guns, including the Glock 27, lay on a table next to the cash. Both videos were made on the same day.

¶ 22   After those exhibits were shown to the jury, the trial court instructed the jury as follows:

"Ladies and gentlemen of the jury, evidence has been received that the defendant has been involved in an offense other than those charged in the Indictment and Complaint. This evidence has been received on the issue of the defendant's identity, motive, intent, and knowledge and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense and if so, what weight should be given to this evidence on the issue of identity, motive, intent, and knowledge."

See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 14, 2014) (hereinafter IPI Criminal No. 3.14).

Thereafter, the State introduced into evidence, over defendant's objection, a still image of the gun shown in the video so that the serial number, BVLK336, was visible. The next three photos showed defendant wearing the same shoes he was wearing on November 18, 2022, when he was arrested.

¶ 23   Defendant made phone calls from jail that were recorded. Over defendant's objection, the recordings were admitted into evidence and played for the jury. In a call on November 19, 2022, defendant talked to a man who asked him how he got "down there." Defendant responded that it was a "long ass story" and said he did not want to talk about it "over the phone" because "they be listening to these phone calls." When the man asked if defendant "drove out there," defendant said, "yeah," and then said he "was in Peoria."

¶ 24      Over defendant's objection, the State introduced evidence of text messages sent to and from his phone on November 17, 2022. One outgoing message was sent at 8:07 p.m. and stated: "On my way back to The city from Peoria." Another outgoing message, sent at 8:08 p.m., stated, "On my way back to the city." An outgoing message at 9:33 p.m. to Tawana Jackson stated, "Hey momma." An incoming message at 9:34 p.m. stated, "Hey son." Location data extracted from defendant's phone showed that on November 17, 2022, the phone was in Peoria at 8:06 and 8:59 p.m. but had left Peoria by 9:15 p.m. At 9:31 and 9:45 p.m., the phone was on a road leading to Chenoa. At 9:49 and 9:50 p.m., the phone was on Route 24.

¶ 25      On cross-examination, Cornwall admitted that defendant told him he loaned his car to someone else on November 17, 2022. Cornwall did not remember the brand of shoes defendant was wearing on November 18, 2022, and said they were "[p]robably not" a "particularly rare or unique brand." Cornwall admitted that he did not know where the photos and videos on defendant's cell phone were taken. No usable fingerprints were recovered from the Glock 27.

¶ 26      Amanda Weathersby testified that she was driving defendant's vehicle alone in Chenoa on November 17, 2022. Weathersby went to the Chenoa police station on October 9, 2023, to "file a police statement." Weathersby met Johnson at the police station on October 9, 2023, and told him she wanted to report a "fleeing and eluding crime" that happened "a few months ago." She told Johnson she took a train to Chenoa to file that police report on October 9, 2023, even though that was not true, as defendant drove her there.

¶ 27      Weathersby returned to the police station later that same day, because she "wanted paperwork that [she] made the statement." She denied that defendant requested that. At that time, she provided the following written statement to Johnson:

          "On November 17 I was told to leave by Chris Jackson to park the car but I

didn't[.] I drove off[.] [A]s I was driving I seen police lights flashing behind me[.] I panic [*sic*] [b]ecause I had open wine and I didn't have a license and drove off. Then I parked the car and called [defendant] where the car was located."

¶ 28 Weathersby testified she did not talk to police until nearly 11 months after her crimes because she "didn't have transportation" to get to the police station and thought she had to go there "in person." She said she "never thought [she] could" provide a statement over the phone. Weathersby said she obtained defendant's car on November 17, 2022, from defendant's stepfather, Chris Jackson, who asked her "to hold it." She said there were two sets of keys to the vehicle and that she had the "spare key." She testified that she also had defendant's cell phone. Weathersby testified that she dated defendant for approximately two years. She and defendant were dating both times she went to the Chenoa police station but broke up a few months after that. Defendant drove her to court to testify.

¶ 29 When the State questioned Weathersby about the night of November 17, 2022, she could not describe what the roadway she was driving on looked like, other than that "it was dark" and "open." She did not remember how many lanes the road had and said she "just remember[ed] driving straight." She said that when she saw emergency lights behind her, she panicked because she "was driving with no license" and "had open alcohol." She said she pulled over and then "panicked" and "pulled off." She did not remember if she came to a complete stop or "how [she] pulled over," explaining, "It was a year and a half ago." She did not know what direction she was traveling when she was pulled over and denied using a navigation app.

¶ 30 Weathersby agreed that during her interview with Johnson, she said she did not stop when the officer pulled her over but "just took off." She testified that she said that because she was not sure if she came to a complete stop. She then testified that she did not "remember [the]

details of what [she] said" to Johnson but just remembered that she "admitted to the crime." She said she "[p]robably" ran through a red light but did not remember if she ran any stop signs. She said she had her headlights on and was trying to turn on the brights because it was dark. She did not remember where the wine bottle was inside the car. She said she was only drinking wine and did not know if there was other alcohol in the car. She said she eventually stopped the car, got out, and "ran and walked down the highway."

¶ 31            Weathersby testified that she abandoned the vehicle on "a road." She said she had defendant's phone and used it to contact someone to "come pick [her] up." She also contacted defendant to tell him where his car was. She said a "casual friend" from Peoria named "Kimberly" picked her up. She did not remember telling Officer Johnson that Chris Jackson picked her up. When counsel asked why Weathersby would have said that, she stated that she "struggle[s] with, like, mental problems, and [she] probably got it mixed up or whatever." She said she had defendant's phone with her when she ran away from the car and "pinged [defendant] the location" so he would know where to find the car. She said she left the phone "in the area" but did not know "exactly where." She did not know what street she left the vehicle on and did not notice any nearby businesses. She denied that defendant asked her to testify falsely.

¶ 32            Thereafter, the trial court gave the jury many instructions, including IPI Criminal No. 314 with respect to evidence of uncharged crimes.

¶ 33            The jury found defendant guilty of all charges.

¶ 34                                C. After Defendant's Trial

¶ 35            Defendant filed a motion for judgment of acquittal or a new trial, arguing that (1) the evidence was insufficient to prove him guilty and (2) the trial court abused its discretion in

allowing the State to introduce images of him "with unrelated firearms and large quantities of cash." The court denied the motion.

¶ 36    Defendant's presentence investigation report (PSI) revealed that defendant was 28 years old. In 2014, defendant committed aggravated robbery with a firearm. He was released from prison in 2018, and less than three months later, he committed aggravated fleeing. While on probation for that offense, defendant committed aggravated fleeing and eluding in a different county in 2020 and was sentenced to 18 months in prison. Less than six months after being released from prison, defendant committed the offenses in this case. Defendant is a tattoo artist and reported that he earns between $50,000 to $65,000 annually. He reported no assets and said he received $291 per month in "Food Stamps/LINK."

¶ 37    At the sentencing hearing, the State asked the trial court to take judicial notice that it filed perjury and obstructing justice charges against Weathersby based on her testimony in this case. The State argued that "based on the nature and circumstances of this offense and the history and character of this defendant, consecutive sentences are required to protect the public from further criminal conduct by this defendant." Specifically, the State requested that defendant be sentenced to a total of 15 years in prison: 10 years for unlawful possession of a weapon by a felon and 5 years for aggravated fleeing. The State noted that defendant had an extensive criminal history, dating back "over 10 and a half years" and including "[s]erious felony offenses." The State argued that "a significant sentence in the Illinois Department of Corrections is necessary to not only deter this defendant by his repeated conduct, but others like him, and to not deprecate the seriousness of the offense."

¶ 38    In mitigation, defendant presented letters from family, friends and coworkers. Defense counsel argued that defendant did not present "such a danger to the community that

consecutive sentences would be necessary." Defense counsel recommended that defendant receive two concurrent four-year prison sentences for the felony offenses, stating that defendant is "very young" and "has a great potential for rehabilitation." Defendant made a statement in allocution, in which he stated his belief that "alcohol is the root cause of [his] bad decision[-]making" and said he would "be seeking help during [his] time of incarceration."

¶ 39    The trial court stated that it considered the PSI, the evidence in aggravation and mitigation, the arguments of counsel, defendant's statement in allocation, and the relevant statutory factors. The court explained that "defendant engaged in conduct that put the entire community at risk" by speeding, turning off his lights, and driving in a car with "open alcohol and a firearm." The court then stated:

    "The evidence at trial, specifically the testimony of Ms. Weathersby, was incredible. I think that *** the jury also identified *** that her testimony was, in essence, made up. She, when asked specifics about the incident itself, she didn't know. I suppose, if you are going to come in and confess to something, you better know what happened, where it happened, when it happened, what you did, where you were stopped initially, where you took off from, what you did after that. She knew none of that. It was obvious to the Court, and apparently obvious to the jury, that her testimony was fabricated.

    Now, that fact in and of itself I don't think it is anything that the Court should consider when imposing a sentence in this case as it relates to the defendant. But it's also apparently true that when she presented herself to the police, months after this stop, the defendant was the one that took her there, parked a short distance away, and she went and gave her story to the police. Again, went back to where the

defendant was. He asked to see her statement is my recollection. She wasn't able to present it to him, and so she went back to the police department for *** a second time, which would seem to indicate that the defendant was directing her conduct, which is, in this Court's opinion, somewhat of an aggravating factor and something that should be considered by the Court. The Court will give that the appropriate weight when considering it."

¶ 40　　　　　The trial court described defendant's criminal record as "extensive and serious, and not that old." After listing defendant's convictions, the court stated:

"[A]t least up until the time this offense occurred, it doesn't seem that there's any break from new criminal activity, which significantly either directly threatens the public, or the aggravated fleeings, which put the entire community at risk if they happened to be out driving a vehicle on those roads at the time this defendant is fleeing the police."

The court found consecutive sentences were "necessary to protect the public from further criminal conduct by the defendant." The court sentenced defendant to consecutive prison terms of nine years for unlawful possession of a weapon by a felon and five years for aggravated fleeing. The court also ordered defendant to serve 364 days in jail for reckless driving and driving with a revoked license and ordered him to pay fines totaling $1,300, assessments of $655, and fees of $2,185.

¶ 41　　　　　Defendant filed a motion to reconsider his sentence, arguing that it was "excessive." The trial court denied the motion.

¶ 42　　　　　This appeal followed.

¶ 43　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 44                                 A. Sufficiency of the Evidence

¶ 45          Defendant argues that the State did not prove beyond a reasonable doubt that he was the driver of his vehicle on November 17, 2022, because Weathersby confessed and the evidence against him was wholly circumstantial.

¶ 46          When presented with a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not our function to retry the defendant when considering a challenge to the sufficiency of the evidence. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). "The trier of fact is best equipped to judge the credibility of the witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *Wheeler*, 226 Ill. 2d at 114-15. Thus, a jury's findings as to credibility are entitled to "great weight." *Wheeler*, 226 Ill. 2d at 115.

¶ 47          "[D]irect evidence either of identification or of any other fact is not required in order to sustain a conviction." *People v. Botulinksi*, 383 Ill. 608, 615 (1943). "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). The trier of fact need not "be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *Hall*, 194 Ill. 2d at 330. "It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Hall*, 194 Ill. 2d at 330.

¶ 48        Based on our examination of the evidence in light of the foregoing principles, a rational trier of fact could have found defendant guilty of the offenses in this case. The vehicle registered to defendant was observed by police to be speeding on Route 24 near Chenoa at approximately 9:50 p.m. on November 17, 2022. Police also observed the driver extinguish the vehicle's headlights and disobey a stop sign. The police officer lost sight of the vehicle but located it soon after at Chenoa Auto Repair with defendant's cell phone on the front passenger seat with a navigation app running. Defendant's phone contained an outgoing message at 8:07 p.m., which stated: "On my way back to The city from Peoria." Surveillance video from Chenoa Auto Repair showed someone wearing shoes with reflective material exiting the vehicle. The next morning, at 7:05 a.m., defendant entered Chenoa Fitness Center, which is located approximately two blocks from Chenoa Auto Repair. Defendant was wearing shoes with reflective material and had a key to his vehicle in his pocket. He had no phone with him and did not know what town he was in. He had to borrow a phone so he could call his girlfriend to pick him up. Based on these facts, the jury could have reasonably determined that defendant was driving his vehicle on the night of November 17, 2022, and was guilty beyond a reasonable doubt of the charged offenses.

¶ 49        Defendant, however, contends that the State failed to present "any direct evidence that identified [him] as the driver of the Dodge Charger" on November 17, 2022. However, direct evidence is not necessary to sustain a conviction. *Botulinksi*, 383 Ill. at 615. Circumstantial evidence is sufficient if it satisfies the jury beyond a reasonable doubt that the defendant committed the offenses. See *Hall*, 194 Ill. 2d at 330. Here, the circumstances described above were sufficient for the jury to conclude that defendant was guilty beyond a reasonable doubt of the charged offenses.

¶ 50    Defendant also argues that the jury's verdict cannot stand because Weathersby testified that she was driving defendant's vehicle on November 17, 2022. We disagree.

¶ 51    As the trial court described at defendant's sentencing hearing, Weathersby's testimony was "incredible." Weathersby did not "confess" to being the driver of defendant's vehicle until 11 months after defendant was charged. When she finally did so, she did not know the date of the incident and lied about how she got to the police station to file a report. In reality, defendant, who was her boyfriend at the time, drove her to the station to make her "statement." When Weathersby returned to the station shortly thereafter, she knew the date of the incident but did not remember details about it and provided an incoherent written statement. When Weathersby testified, she was unable to describe the events of November 17, 2022, including where she was, what she did, where she left defendant's car, or where defendant's phone was. Additionally, Weathersby's testimony about how she came into possession of defendant's vehicle was inconsistent with defendant's own statement to police. Weathersby said that defendant's stepfather gave her defendant's vehicle "to hold," while defendant told police that he let his "girl['s] brother" borrow it. Based on Weathersby's obvious lack of knowledge about the event and the many contradictions and inconsistencies in her story, the jury could have reasonably concluded that her testimony was fabricated and, therefore, disregarded it.

¶ 52    Defendant relies on *People v. Szymanowski*, 182 Ill. App. 3d 885 (1989), to support his contention that the evidence was insufficient to prove his guilt. In that case, the defendant was found guilty of attempted murder and aggravated battery, even though the victim testified at trial that someone else beat her. *Szymanowski*, 182 Ill. App. 3d at 885, 888. The appellate court reversed the defendant's conviction, noting that circumstantial evidence to support a conviction "must be inconsistent with any reasonable hypothesis of defendant's innocence." *Szymanowski*, 182 Ill.

App. 3d at 888. The court found that standard was not met where the victim "steadfastly maintained at trial" that someone other than the defendant beat her. *Szymanowski*, 182 Ill. App. 3d at 888. The court stated that the victim's "testimony was not impeached nor directly contradicted and, therefore, cannot be disregarded." *Szymanowski*, 182 Ill. App. 3d at 888-89.

¶ 53        *Szymanowski* is distinguishable for several reasons. First, the standard of review employed by the appellate court in that case, reasonable hypothesis of innocence, "is no longer viable in Illinois." *People v. Pintos*, 133 Ill. 2d 286, 291 (1989). Instead, the "reasonable doubt test set forth in [*Collins*] should be applied in reviewing the sufficiency of the evidence in all criminal cases, whether the evidence is direct or circumstantial." *Pintos*, 133 Ill. 2d at 291. As explained above, the evidence in this case satisfied the "reasonable doubt" test. Furthermore, unlike the victim in *Szymanowski*, whose testimony was neither impeached nor contradicted, Weathersby's testimony at trial was both impeached and contradicted by her earlier statements to Johnson and defendant's statement to police. As the trial court noted at defendant's sentencing, Weathersby's testimony was "incredible" and presumably disregarded by the jury. The jury, as the trier of fact, was free to reject Weathersby's testimony that she was the one driving the Charger on November 17, 2022. See *Wheeler*, 226 Ill. 2d at 114-15 (stating credibility is for the jury to decide and the jury's credibility determinations are entitled to "great weight").

¶ 54        Defendant also relies on *People v. Kinsloe*, 281 Ill. App. 3d 799 (1996), to support his insufficient evidence claim. In that case, the defendant was convicted of heinous battery for setting his wife on fire. *Kinsloe*, 281 Ill. App. 3d at 810. Prior to trial, the victim implicated the defendant, but at trial, she "testified that the defendant did not do it" and "steadfastly maintained the defendant's innocence." *Kinsloe*, 281 Ill. App. 3d at 810, 811. The appellate court reversed the

defendant's conviction, finding that the evidence was not "inconsistent with [the victim]'s trial testimony" that she accidentally lit herself on fire. *Kinsloe*, 281 Ill. App. 3d at 813.

¶ 55     *Kinsloe* is also distinguishable. In *Kinsloe*, it was not clear that a crime was committed because the victim testified at trial that she accidentally lit herself on fire. Here, on the other hand, Johnson's testimony established that the driver of the Charger violated numerous criminal and traffic laws. The only issue at trial was whether defendant was the driver. As explained above, the evidence in this case established beyond a reasonable doubt that defendant was the driver of the Charger.

¶ 56     Finally, defendant relies on our decision in *People v. Akins*, 128 Ill. App. 3d 1009 (1984), to support his contention that the evidence was insufficient to prove his guilt. In that case, we affirmed the defendant's conviction for armed robbery, even though no fingerprints were found at the scene and a witness failed to identify the defendant as the robber. *Akins*, 128 Ill. App. 3d at 1012, 1016. We concluded that the evidence was sufficient to support the defendant's conviction where (1) police discovered the defendant "lying injured some 200 feet from where the robbery vehicle crashed," (2) a trail led from the vehicle to the defendant, (3) the defendant matched the description of the robbery suspect, and (4) the defendant's testimony that he was dumped by kidnappers "into a soybean field near where a robbery vehicle crashed" was "simply incredible." *Akins*, 128 Ill. App. 3d at 1012-13.

¶ 57     Defendant argues that the evidence against him "is more fragmented and ambiguous than in *Akins*" because "no one saw [him] driving the Charger," Officer Johnson lost sight of the Charger for several minutes during the pursuit, and he was not identified and arrested until the following morning. Despite defendant's contention to the contrary, these facts do not establish that no rational jury would find him guilty beyond a reasonable doubt where the evidence

established that (1) the Charger was registered to and owned by defendant, (2) defendant's phone was found inside the vehicle, (3) the driver fled from the car on foot, (4) the driver was wearing shoes with reflective markings, and (5) early the next morning, defendant entered a business in close proximity to where the car was abandoned wearing shoes with reflective markings, with a key to the car in his pocket and no phone. When viewed in the light most favorable to the State, the evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt. Thus, we decline to reverse defendant's convictions on this basis.

¶ 58                                 B. Admission of Videos

¶ 59        Next, defendant argues that the trial court abused its discretion in granting the State's motion *in limine*, which allowed the State to introduce videos showing defendant with cash, "cannabis paraphernalia," and weapons because (1) the videos were not relevant and admissible under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) and (2) their probative value was substantially outweighed by their prejudicial effect.

¶ 60        We will reverse a trial court's grant of a motion *in limine* only if the court committed "a clear abuse of discretion." *People v. Williams*, 188 Ill. 2d 365, 369 (1999). "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 61        Rule of Evidence 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). This evidence, referred to as other-crimes evidence or other-act evidence, "is not considered irrelevant; instead, it is objectionable because such evidence has 'too much' probative value." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)). Although evidence of other crimes is not admissible to

prove the defendant's propensity to commit the charged crime, it may be admissible for any nonpropensity purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991). Nevertheless, such evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 62        "[T]he probative value of the other-crimes evidence must be measured by reference to what the evidence is probative of—the non-propensity fact it was offered to prove—and must be weighed against 'a high risk of prejudice.' " *People v. Smith*, 2025 IL App (4th) 230866-U, ¶ 56. If evidence is admitted for a valid nonpropensity purpose, the court must " 'restrict the evidence to its proper purpose *** and instruct the jury accordingly.' " *Smith*, 2025 IL App (4th) 230866-U, ¶ 56 (quoting Ill. R. Evid. 105 (eff Jan. 1, 2011)). A proper limiting instruction "substantially reduce[s] any prejudicial effect created by the admission of the prior-offense evidence." *Illgen*, 145 Ill. 2d at 376.

¶ 63                              1. *Other-Crimes Evidence*

¶ 64        Here, defendant contends that the trial court abused its discretion in admitting into evidence, over his objection, two videos extracted from his phone that showed the Glock 27 that was found in his vehicle.

¶ 65        Defendant concedes that the videos were properly admitted to the extent that they show him in possession of the Glock. See *People v. Liner*, 356 Ill. App. 3d 284, 294 (2005) ("Evidence regarding a weapon may be admitted into evidence where there is proof to connect it to the defendant and the crime.") However, defendant argues that cash, "cannabis paraphernalia,"

and other weapons that can be seen in the videos constituted inadmissible other-crimes evidence under Rule 404(b). We disagree.

¶ 66    Defendant argued in his motion for a new trial that the videos were inadmissible because of the presence of cash and other weapons in them. Defendant now argues for the first time on appeal that the videos also showed "cannabis paraphernalia." Because defendant raised this issue for the first time on appeal, it is forfeited. See *People v Enoch*, 122 Ill. 2d 176, 186 (1988) (stating a defendant forfeits any issue not raised in a written motion for a new trial). Thus, we need not address this argument. Forfeiture notwithstanding, no "cannabis paraphernalia" is readily visible in either video, so jurors would likely not have even seen it when the videos were played for them at trial. Furthermore, even if jurors saw "cannabis paraphernalia," it would not be evidence of "other crimes" because it is not illegal to possess "cannabis paraphernalia." See 410 ILCS 705/10-5(a)(1) (West 2022).

¶ 67    Similarly, the presence of cash in the videos did not constitute "[e]vidence of other crimes, wrongs or acts." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); See *People v. McBride*, 2020 IL App (2d) 170873, ¶ 36. Defendant cites *McBride* to support his contention that "possession of large amounts of cash currency is often associated with criminal enterprises." In fact, the Second District in *McBride* stated: "Carrying large amounts of cash *can be* associated with criminal enterprises." (Emphasis added.) *McBride*, 2020 IL App (2d) 170873, ¶ 32. However, the court in *McBride* also stated that "a person may possess large amounts of cash for legitimate reasons." *McBride*, 2020 IL App (2d) 170873, ¶ 36. In *McBride*, the court found that because of the defendant's prior felony drug convictions, the defendant's possession of a large amount of cash "tended to portray defendant as a drug dealer." *McBride*, 2020 IL App (2d) 170873, ¶ 32. Therefore, the court found that the probative value of a photo of cash found in the defendant's

bedroom "was outweighed by its prejudicial effect." *McBride*, 2020 IL App (2d) 170873, ¶ 32. Nevertheless, the court refused to find that admission of the photo of cash "was akin to the improper admission of other-crimes evidence." *McBride*, 2020 IL App (2d) 170873, ¶ 36. The court ultimately concluded that the trial court's admission of the photo was harmless error. *McBride*, 2020 IL App (2d) 170873, ¶ 38.

¶ 68        Here, no evidence was presented at trial that defendant had any prior drug convictions. Rather, evidence was presented that defendant was a tattoo artist. Thus, defendant's cash could have come from that legitimate business. Without any evidence suggesting that defendant's cash came from an illicit source, we reject defendant's contention that the presence of cash in the video constituted evidence of other crimes.

¶ 69        Even if the cash in the videos did constitute prejudicial other-crimes evidence, the presence of that cash, as well as other weapons, did not make the videos inadmissible because the videos were not admitted to show other weapons or cash but to show defendant's possession of the Glock found in his vehicle in order to establish that defendant possessed that weapon on November 17, 2022. Where the State offers a video to show that the defendant committed a crime he was charged with, it is properly admitted even if it shows that the defendant committed one or more other crimes. See *People v. Welch*, 2025 IL App (1st) 231116, ¶ 37. In this case, the videos contained relevant and probative evidence showing defendant holding and standing next to the gun found in his vehicle. That the videos also showed defendant with other weapons and cash does not render them inadmissible. See *Welch*, 2025 App (1st) 231116, ¶ 37.

¶ 70        Defendant relies on *People v. Gregory*, 22 Ill. 2d 601 (1961), to support his contention that the trial court abused its discretion in admitting the videos in this case. However, *Gregory* is clearly distinguishable. In that case, the supreme court ruled that the portion of the

defendant's confession in which he referred to other crimes should have been redacted and not provided to the jury. *Gregory*, 22 Ill. 2d at 603. However, in reaching that conclusion, the court stated that irrelevant material should not be deleted from a statement or confession if "to do so would seriously impair its evidentiary value." *Gregory*, 22 Ill. 2d at 603-04.

¶ 71 Here, as explained in its motion *in limine*, the State had already significantly edited the videos to remove 14 seconds from one video and 11 seconds from the other video, which showed defendant manipulating cash. Further redaction of the videos would not have been possible without seriously impairing their evidentiary value. Unlike the confession at issue in *Gregory*, where the irrelevant material could have been deleted while keeping the remainder of the confession intact, here, that was not possible. For example, in the first video, someone was shown holding the Glock for the first seven seconds of the video. Defendant's face was not shown until the last two seconds of the video, and, when it was, defendant was waving cash next to his face. Therefore, it would have been impossible to show defendant was the one holding the Glock by reducing that video to less than the nine-second version shown to the jury. Similarly, the second video was only three seconds long and showed the Glock in defendant's presence. It is hard to imagine how that video could be redacted any further without seriously impairing its evidentiary value.

¶ 72 2. *Prejudicial Impact Versus Probative Value*

¶ 73 Defendant also argues that "the presence of the additional firearms, the stacks of currency, and the cannabis make the videos unfairly prejudicial."

¶ 74 "It is the function of the trial court to weigh the probative value of the evidence against the risk of unfair prejudice it carries; we will not overturn a court's decision on that

- 23 -

balancing process absent an abuse of that discretion." *People v. Morales*, 2012 IL App (1st) 101911, ¶ 39. Here, we find no abuse of discretion.

¶ 75 As defendant concedes, the videos were relevant and probative as to his possession of the Glock, which was the main subject of both videos. Additionally, as set forth above, there was no prejudice to defendant as a result of cash in the videos because cash does not necessarily constitute evidence of other crimes. See *McBride*, 2020 IL App (2d) 170873, ¶ 36. Furthermore, any prejudice to defendant caused by the presence of cash or other weapons in the videos did not exceed the videos' probative value because the jury was provided a proper limiting instruction, not once, but twice: when the evidence was admitted and after the close of evidence. These limiting instructions "substantially reduced any prejudicial effect created by the admission of the prior-offense evidence." *Illgen*, 145 Ill. 2d at 376. "Faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system." *Illgen*, 145 Ill. 2d at 376.

¶ 76 Here, the trial court carefully considered the content of the videos, acknowledging that the presence of cash and other weapons in them was prejudicial; nevertheless, the court determined that the videos' probative value outweighed their prejudicial impact because the videos were probative of defendant's possession of the Glock. We find that decision not to be an abuse of discretion, particularly since the court provided the jury with a limiting instruction. For these reasons, the court did not abuse its discretion in admitting the videos as evidence.

¶ 77 C. Constitutionality of Statute

¶ 78 Defendant next argues that section 24-1.1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/24-1.1 (West 2022)), which criminalizes possession of a weapon by a felon, is unconstitutional on its face.

¶ 79        Section 24-1.1(a) of the Code makes it unlawful

> "for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon \*\*\* or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2022).

Defendant contends that this statute unconstitutionally infringes on the right to bear arms set forth in the second amendment of the United States Constitution, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 80        Statutes are presumed constitutional, and the party challenging a statute's constitutionality has the burden of establishing a clear violation. *People v. Huff*, 2025 IL App (4th) 240762, ¶ 14. " ' 'A party bringing a facial challenge to a statute faces a particularly heavy burden.' " *Huff*, 2025 IL App (4th) 240762, ¶ 15 (quoting *People v. Villareal*, 2023 IL 127318, ¶ 14). We review the constitutionality of a statute *de novo*. *Huff*, 2025 IL App (4th) 240762, ¶ 14.

¶ 81        The United States Supreme Court has "recognized that the Second and Fourteenth Amendments [(U.S. Const., amends. II, XIV)] protect the right of an ordinary, law-abiding citizen to possess a handgun" inside and outside the home "for self-defense." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-10 (2022). In *Bruen*, the Supreme Court announced a test for assessing the constitutional validity of laws seeking to regulate conduct protected by the second amendment. See *Bruen*, 597 U.S. at 17. The court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. To justify regulation of that protected conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*,

597 U.S. at 17. Thus, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961)).

¶ 82    Defendant argues that "[c]onsistent with *Bruen*, we should find that section 24-1.1(a) violates the second amendment on its face." We disagree.

¶ 83    In *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21, we rejected the very same argument defendant makes here and held that *Bruen* does not apply to defendants who are felons because "[t]he second and fourteenth amendments protect the right of 'law-abiding citizens' to possess handguns." (quoting *Bruen*, 597 U.S. at 9-10). We explained:

> "*Bruen*'s historical-tradition test applies to regulations affecting *law-abiding* citizens' possession of firearms. [Citations.] As a felon, defendant, by definition, is not a law-abiding citizen. Thus, defendant cannot show that his conduct was presumptively protected by the second amendment, and therefore, he does not fall within the scope of *Bruen*. As a result, defendant cannot show that section 24-1.1(a) of the Code violates the second amendment on its face under the *Bruen* framework." (Emphasis in original.) *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21.

¶ 84    Defendant asks us to reconsider our holding in *Burns*. We decline to do so, noting that the Illinois Appellate Court has repeatedly and consistently held that section 24-1.1(a) of the Code is constitutional on its face under the second amendment. See *e.g.*, *People v. Boss*, 2025 IL App (1st) 221855, ¶¶ 33-36; *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68; *People v. Travis*, 2024 IL App (3d) 230113, ¶ 33; *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 39; *People v.*

*Stokich*, 2024 IL App (4th) 240192-U, ¶ 45; *People v. Dillard*, 2024 IL App (4th) 231090-U, ¶ 27; *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶ 16; *People v. Langston*, 2023 IL App (4th) 230162-U, ¶ 19.

¶ 85        Furthermore, the United States Supreme Court has confirmed that *Bruen* did not affect its previous holding that "prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " *United States v. Rahimi*, 602 U.S. 680, 682 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008)). Accordingly, defendant's facial challenge to the constitutionality of the statute fails.

¶ 86                              D. Defendant's Sentences

¶ 87        Illinois courts have long recognized that the imposition of a sentence is left to the sound discretion of the trial court and will not be altered upon review absent an abuse of that discretion. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). The court's decisions regarding sentencing are entitled to great deference and weight. *Perruquet*, 68 Ill. 2d at 154.

¶ 88        Sentences are presumed to be proper. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28. When a sentence falls within the statutorily prescribed range, it is not excessive or an abuse of discretion unless it greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. "The spirit and purpose of the law are promoted when the trial court's sentence reflects both the seriousness of the offense and gives sufficient consideration to the defendant's rehabilitative potential." *Etherton*, 2017 IL App (5th) 140427, ¶ 28. The seriousness of the offense is one of the most important factors that the court must consider. *Etherton*, 2017 IL App (5th) 140427, ¶ 28.

¶ 89        If mitigating evidence is presented at the sentencing hearing, a reviewing court presumes the trial court took that into consideration, absent evidence to the contrary. *Etherton*,

2017 IL App (5th) 140427, ¶ 29. "The trial court is not required to recite or assign a value to each factor presented at the sentencing hearing." *Etherton*, 2017 IL App (5th) 140427, ¶ 29. The defendant bears the burden of affirmatively establishing that the sentence was based on improper considerations, "and we will not reverse a sentence imposed by a trial court unless it is clearly evident that the sentence was improper." *Etherton*, 2017 IL App (5th) 140427, ¶ 29.

¶ 90 Applying these principles to the instant case, we cannot say the trial court's consecutive prison sentences of nine years for unlawful possession of a weapon by a felon and five years for aggravated fleeing were excessive or an abuse of discretion. The court stated that it considered defendant's PSI and all aggravating and mitigating factors. The sentences were both within the statutory ranges. See 720 ILCS 5/24-1.1(e) (West 2022) (unlawful possession of a weapon by a felon is a Class 3 felony with an enhanced sentencing range of 2 to 10 years in prison); 625 ILCS 5/11-204.1(a)(b) (West 2022); 730 ILCS 5/5-4.5-40(a) (West 2022) (aggravated fleeing and eluding is a Class 3 felony for subsequent violators with a sentencing range of 2 to 5 years in prison). In imposing its sentences, the court noted that defendant engaged in conduct that put the entire community at risk. The court also appropriately took into consideration that defendant assisted his witness, Weathersby, in providing "incredible" and "fabricated" testimony at trial and statements to police by driving her both to the police station and to court.

¶ 91 Defendant, however, contends that the trial court should have considered his alcohol addiction as a mitigating factor because defendant mentioned it in his statement in allocution. We disagree. Both our supreme court and this court have held that a defendant's substance abuse need not be regarded as mitigating in sentencing. See *People v. Mertz*, 218 Ill. 2d 1, 83 (2005); *People v. Klein*, 2022 IL App (4th) 200599, ¶ 36; *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105.

¶ 92 Defendant also argues that the trial court failed to fully consider his rehabilitative potential and placed too much emphasis on punishment, rather than rehabilitation. Both the potential for rehabilitation and punishment are proper sentencing factors. See *People v. McComb*, 312 Ill. App. 3d 589, 596 (2000). The weight to be given to any proper factor is left to the sound discretion of the trial court. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. As a reviewing court, we may not reweigh the factors the court used in its sentencing decision. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010).

¶ 93 Here, defendant is asking us to reweigh the sentencing factors, which we may not do. See *Alexander*, 239 Ill. 2d at 214. Defendant has failed to affirmatively establish that his sentence was based on improper considerations or was clearly improper for some other reason. Thus, the trial court did not abuse its discretion in sentencing defendant. See *Etherton*, 2017 IL App (5th) 140427, ¶ 28.

¶ 94                                             E. Assessments

¶ 95 Defendant argues that his counsel was ineffective for failing to file an application for a waiver of assessments. The State concedes error.

¶ 96 A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const. amend VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant can demonstrate ineffective assistance of counsel by showing that "(1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90.

¶ 97        Section 124A-20(b) of the Code of Criminal Procedure of 1963 provides that a defendant may apply for a waiver of assessments no later than 30 days after his or her sentencing. 725 ILCS 5/124A-20(b) (West 2024). " 'Assessments' means any costs imposed on a criminal defendant under Article 15 of the Criminal and Traffic Assessment Act [(705 ILCS 135/art. 15 (West 2024))], but does not include violation of the Illinois Vehicle Code [(625 ILCS 5/1-100 *et seq.* (West 2024))] assessments except in a county having a population of more than 3,000,000." 725 ILCS 5/124A-20(a) (West 2024). "If the court finds that the applicant is an indigent person, the court shall grant the applicant a full assessment waiver exempting him or her from the payment of any assessments." 725 ILCS 5/124A-20(b)(1) (West 2024). "Indigent person" includes any person who "is receiving assistance under one or more *** means-based governmental public benefits programs," including "Supplemental Nutrition Assistance Program [(SNAP)]." 725 ILCS 5/124A-20(a)(1) (West 2024).

¶ 98        Here, defendant was assessed costs based on his felony convictions of aggravated fleeing and unlawful possession of a weapon by a felon. However, defendant's PSI indicated that he received SNAP benefits in the form of food stamps. Thus, defendant was an "indigent person" and statutorily eligible for a waiver of assessments for costs imposed for his felony convictions. See 725 ILCS 5/124A-20(a)(1), (b) (West 2024)); *People v. Glas*, 2025 IL App (4th) 241199-U, ¶ 34.

¶ 99        Defense counsel should have filed an application for a waiver of defendant's felony assessments. See *People v. Chase*, 2025 IL App (4th) 230407-U, ¶ 89. However, counsel failed to do so. Defense counsel performed deficiently by failing to timely file an application for a waiver of criminal assessments for defendant, and counsel's failure prejudiced defendant because there is a reasonable probability that the fees imposed against defendant would have been waived. See

*Glas*, 2025 IL App (4th) 241199-U, ¶¶ 34-35; *Chase*, 2025 IL App (4th) 230407-U, ¶ 90. Thus, we remand the matter to provide defendant an opportunity to file a waiver of assessments. See *Glas*, 2025 IL App (4th) 241199-U, ¶ 35; *Chase*, 2025 IL App (4th) 230407-U, ¶ 90.

¶ 100                            III. CONCLUSION

¶ 101        For the reasons stated, we affirm the trial court's judgment and remand to provide defendant an opportunity to file an assessment waiver.

¶ 102        Affirmed in part and remanded with directions.